

# IN THE
# TENTH COURT OF APPEALS

### No. 10-06-00092-CV

**HOT ROD HILL MOTOR PARK AND**
**ROGER DEEWAYNE BROWN,**

                                                            **Appellants**

 **v.**

**DONMICHAEL LUCAS TRIOLO,**

                                                            **Appellee**

---

**From the 361st District Court**
**Brazos County, Texas**
**Trial Court No. 04-001812-CV-361**

---

## OPINION

---

Hot Rod Hill Motor Park is a race track located on Roger Deewayne Brown's property. Donmichael Lucas Triolo sued Brown and Hot Rod Hill, alleging that the track constitutes a nuisance. The trial court granted a temporary restraining order prohibiting races and subsequently issued a temporary injunction that allowed Brown to conduct races, but ordered that races end by 11:00 p.m. and imposed noise level restrictions.

A jury later determined that the track constitutes a nuisance and awarded Triolo $3,000 in damages for loss and enjoyment of his property, but no damages for loss of market value. The trial court entered a final judgment permanently enjoining Brown from conducting any races of motorized vehicles for either competition or practice. Brown and Hot Rod Hill challenge the permanent injunction on grounds that (1) the trial court failed to properly balance the equities before issuing the injunction; and (2) the injunction is more restrictive than justified by the evidence. We affirm.

## BALANCING THE EQUITIES

In his first issue, Brown contends that the trial abused it discretion by imposing a permanent injunction because: (1) the trial court failed to balance the equities; and (2) the equities do not support a permanent injunction.

### Whether the Trial Court Failed to Balance the Equities

Question two of the jury charge asked whether Brown and Hot Rod Hill should be permanently enjoined from "directly or indirectly conducting or allowing any races of motorized vehicles, both practice and competitive," to which the jury answered, "Yes." According to Brown, this was an issue for the trial court, not the jury, but the trial court merely adopted the jury's finding without balancing the equities. Triolo concedes that the question was improper, but argues that (1) Brown failed to preserve the issue for appeal, having failed to object to the question at trial; and (2) the record does not support a finding that the trial court failed to balance the equities.

Regardless of whether the question was proper or the issue was preserved, the record is devoid of evidence indicating that the trial court issued an injunction without

balancing the equities. *See Winfield v. Lamoyne*, No. 05-94-01851-CV, 1995 Tex. App. LEXIS 2553, at *15 (Tex. App.—Dallas Oct. 16, 1995, writ dism'd) (not designated for publication) (Winfield alleged that the trial court failed to balance the equities, but provided no evidence of such a failure, arguing instead that he "suffers more harm from the injunction than LaMoyne suffers from the violations"); *see also Estancias Dallas Corp. v. Schultz*, 500 S.W.2d 217, 221 (Tex. Civ. App.—Beaumont 1973, writ ref'd n.r.e.) ("[T]here is an implied finding that the trial court balanced the equities in favor of plaintiffs by entering the judgment granting the injunction."). Neither did Brown seek a hearing or request findings of fact. *See Lee v. Bowles*, 397 S.W.2d 923, 924 (Tex. Civ. App.—San Antonio 1965, no writ) (trial court held a separate hearing on the issue of balancing the equities); *see also Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 52 (Tex. 2003) ("When neither party requests findings of fact and conclusions of law, it is implied that the trial court made all fact findings necessary to support its judgment"); *Operation Rescue-Nat'l v. Planned Parenthood*, 937 S.W.2d 60, 82 (Tex. App.—Houston [14th Dist.] 1996), *aff'd as modified by* 975 S.W.2d 546 (Tex. 1998) ("When part of a cause is decided by a jury and part by the court, the party appealing the court-decided issue should request findings of fact and conclusions of law."). The record before us does not establish that the trial court failed to balance the equities.

### Whether the Equities were Properly Balanced

Abatement of a nuisance is a "discretionary decision for the judge after the case has been tried and the jury discharged." *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 286 (Tex. 2004). The trial court must balance the equities before issuing an

injunction, considering injury to (1) the defendant and the public were the injunction granted and (2) the complainant were the injunction denied. *See Storey v. Cent. Hide & Rendering Co.*, 226 S.W.2d 615, 618-19 (Tex. 1950). An injunction will ordinarily be denied if the "injury to the complainant is slight in comparison to the injury caused the defendant and the public." *Id.* at 619. Conversely, an injunction may issue if the injury to the defendant and the public is slight when compared to injury suffered by the complainant. *See id*. "Public convenience or necessity, economic burden to the defendant, and the adequacy of a legal remedy may affect this balance." *McAfee MX v. Foster*, No. 02-07-00080-CV, 2008 Tex. App. LEXIS 968, at *8 (Tex. App.—Fort Worth Feb. 7, 2008, pet. denied), *petition for cert. filed*, No. 08-639 (U.S. Nov. 12, 2008). We review a trial court's decision to grant a permanent injunction for abuse of discretion. *See Operation Rescue-Nat'l v. Planned Parenthood of Houston & Se. Tex., Inc.*, 975 S.W.2d 546, 560 (Tex. 1998).

**Factual Background**

In 1999, Brown began building Hot Rod Hill, a sole proprietorship, working twelve to sixteen hours a day for three years to complete it. He sold rental properties and racing equipment to fund construction. He purchased other equipment that he had to repair to build the track.

The track is affiliated with the International Motor Contest Association. The racing season begins in March and ends in October. Races are held on nineteen or twenty dates out of thirty-two potential dates, approximately 160 hours of racing per year. Sixty to eighty cars usually participate, but there can be up to one hundred.

Triolo's current home is about one-half to three-quarters of a mile from the track. When suit was filed, he resided in a home located half a mile from the track. He testified that races run as late as 1:30 a.m. and resume around 7:30 a.m. on Sunday. Triolo complained that the noise is loud, excessive, irritating, annoying, constant, sounds like it is in his backyard, prevents him from sleeping or enjoying dinner with his family, and requires him to increase the volume of the television. He hears motors revving and cars backfiring. He cannot escape the noise and can hear it any day of the week. On weekends, he and his family leave home to avoid the noise. He has measured the noise with a decibel meter and took readings in excess of eighty decibels.

Triolo purchased nine lots in the area for $69,000. He sold eight lots at $20,000 each and built his new home on lot nine. He said that he could have made more money if not for the track, losing approximately $3,000 to $5,000 per lot. He cannot remain in his home if the track remains open. If forced to sell, the track will limit the potential market. He would have no reason to sell if the track is closed.

Several homeowners in the area testified that the noise from the track is excessive.[1] They described the noise as constant, nerve-racking, unbelievable, intolerable, and inconvenient. It echoes, sounds like a "locomotive coming through the house," and causes windows and light fixtures to shake. Residents have difficulty

---

[1] Brown argues that the trial court could not consider this evidence because: (1) this is a suit for private nuisance, for which an injunction is intended to eliminate harm to Triolo, not the public at large; and (2) the harm to non-parties, were the injunction denied, is not a proper consideration. However, the testimony of non-parties has been considered in injunction suits. *See McAfee MX v. Foster*, No. 02-07-00080-CV, 2008 Tex. App. LEXIS 968, at *4-5 (Tex. App.—Fort Worth Feb. 7, 2008, pet. denied) (testimony from plaintiffs and two other neighbors not parties to the suit); *see also Estancias Dallas Corp. v. Schultz*, 500 S.W.2d 217, 221-22 (Tex. Civ. App.—Beaumont 1973, writ ref'd n.r.e.) (several neighbors provided testimony similar to that of the plaintiffs who alleged that an air conditioning unit constituted a nuisance and should be enjoined). Nor did Brown object to this evidence. *See* TEX. R. APP. P. 33.1.

sleeping, having a conversation at home or over the telephone, watching television, and spending time outdoors. The noise has even driven some residents from their homes on Saturday nights. Joyce Watkins testified that her family no longer visits because her grandchildren cannot sleep at night. Felicia Boegner built a privacy fence to block out the noise and lights, but can still hear the noise. Darrell Luedke can hear the noise even though his home consists of walls with twelve inches of insulation and is separated from the track by a forest of trees.

The Sheriff's Department has received numerous complaints and issued several warnings or citations regarding the noise and lateness of the races. Deputies described the noise as "somewhat deafening," loud, excessive, disturbing, and irritating. It made conversing with complainants difficult. On one occasion, Brown was issued a citation after receiving a warning approximately one hour earlier. On another occasion, he received a citation approximately one hour before races ended around 12:30 a.m. The deputies' noise measurements often revealed levels exceeding eighty or ninety decibels. The Department has received numerous complaints in a single night.

Brown recalled one occasion where races ran until 1:30 or 1:45 a.m., claming that an ambulance, which he requires to be present during races, left the scene and did not return until late. He also admitted running past 12:00 a.m. on about five occasions. Since the temporary injunction, he has implemented procedures for completing races by 11:00 p.m. He procured an ambulance that will be available during the races. Each race ends within a certain time period, regardless of whether all laps are completed. Racers must control their cars to avoid delaying the races and must be on time. Brown no

longer holds the show for racers who have been rained out at other tracks or are running late. Cars are lined up waiting to begin the next race. Racers Michael Pitts and James Spear testified that Brown has not exceeded the time limit and races have been cut short due to time constraints.

Brown has also taken measures to reduce the noise. He requires all racers to use a muffler on their cars. Mufflers may be packed or equipped with a turn-down, which directs sound towards the ground, to reduce noise. Failure to adhere to muffler requirements results in penalties or disqualification. Spear has observed Brown enforce the muffler requirement and has noticed a significant reduction in the noise level at the track. Dawn Pitts testified that the mini-sprint racers all use mufflers and pack the mufflers if the cars are still too loud. Michael testified that the track has more restrictions than any other track where he races.

Brown has also brought in trailer houses, enlarged the ponds on his property, planted foliage, installed various barriers around the track, prohibited the use of parts that create excessive noise, changed the body styles on some cars, and limited the types of cars that may be raced, all in an effort to reduce the noise. Chris Kehl, an employee with O'Reilly Auto Parts, testified that Brown has declined to race certain classes of cars because of the noise they make. Brown also plans to install fountains, require racers to purchase a stall for their cars, and add more bleachers. He has already begun building a carport cover along the edge of the property.

David Cooper, Triolo's sound expert, conducted two tests at the Luedke home. The first test revealed readings of 88 and 89 decibels. The second test revealed a

reading of 90 decibels three different times during the same race. These tests were conducted after the temporary injunction became effective. Cooper provided the jury with a recording of various decibel levels.

Cooper also provided opinions regarding Brown's noise-reduction measures. He testified that bodies of water on the ground will not prevent the noise from traveling. Fountains will affect higher frequencies, but not the lower frequencies that travel farther. Some of Brown's barriers, specifically a wooden catch fence and billboards, vibrate easily and would not have much impact. Depending on its depth, foliage could affect lower frequencies; yet, Cooper was surprised at the noise levels he received at the Luedke home, given the forest of trees located between the home and the track. Turn-downs on the mufflers would probably reduce the sound. Brown had reduced some sound, but not that of the race cars. Cooper testified that a football stadium berm would reduce the sound a "pretty good bit."

Several witnesses testified that the noise has been reduced since the temporary injunction. Ricky Denman can barely hear the noise unless the wind blows in a certain direction. Tim Dockery testified that the noise has been reduced and is not unreasonable. Christie Bomnskie testified that the track is quieter now and races no longer run past 11:00 p.m. Her three children, who did not reside in the home before suit, are able to sleep and the noise has never forced her to leave home. She cannot hear the noise over the television. Clifford Crenshaw had signed a petition alleging that the track is a nuisance. He now believes the problems have been corrected. He has noticed a substantial reduction in noise and barely notices the noise.

Brown testified that the track is surrounded by industrial buildings, an industrial park, electric building, oil field with pump jacks that run twenty-four hours a day, airport, livestock barn, auction barn, highway, and club. Spear testified that about ten oil-field businesses operate in the area 24/7. Denman testified that the highway is louder than the track. Dockery testified that an oil well located two properties to the east of his property is louder than the track and runs 24/7. He identified other noises originating from highway traffic and oil-field trucks. Boegner testified that she is not bothered by the oil-well noise. Luedke testified that he can occasionally hear cows from the livestock barn, but not at 1:00 a.m.

Michael testified that he has raced at other tracks that are similarly situated to Hot Rod Hill. Kehl testified that the track is essentially the same as the other ten or fifteen tracks he has visited, *i.e.*, a dirt oval track, and for the most part is similarly situated to these other tracks. Michael, Kehl, Spear, Denman, and Bomnskie all testified that the track is in an appropriate location. Spear believed that people would still complain even if Brown moved the track elsewhere.

Brown and other witnesses testified that the track benefits the community. Families visit the track for entertainment and recreation. They barbecue, visit, and camp-out. The track does not charge for camping. Patrons must adhere to certain behavioral standards and alcohol is not sold at the track. School-age drivers must maintain passing grades at school and proper conduct at home. When a racer damages another racer's car, the racers handle the situation without fighting. Brown holds a driving school on Sunday afternoons. Spear testified that the track provides

opportunities for children to ride in and drive the race cars. Michael testified that racing has changed the lives of a couple of young men whom he knows.

The track has also assisted with charitable events. Without the track, Spear did not believe that racers would be able to participate in charitable works and programs. Michael and his wife Dawn are members of the Brazos Mini-Sprint Association, which donates money and participates in benefits and other community events.

Brown testified that racers come from all over Texas and even out of state. He testified that the track attracts new businesses, such as chassis, fabrication, machine, graphics, lettering, manufacture, design, molds, and fiberglass shops. Local parts and fuel businesses sell their products at the track. A local performance shop provides pieces, gauges, seats, etc. Michael testified that out-of-town patrons conduct business with the locals. Dockery attends races at the track and testified that out-of-town patrons spend money at local convenience stores, eat at restaurants, buy gas, and buy food. Kehl testified that O'Reilly sponsors events at the track and will continue to be involved even if it is not actually a sponsor. He testified that several national series are interested in racing at the track and O'Reilly would not sponsor an event that is detrimental either to its business or to the community.

Michael testified that he is unsure of whether the Mini-Sprint Association could exist without the track. Although the mini-sprint racers race at both Hot Rod Hill and other tracks, Dawn testified that closing the track could take away the hobby for some members. Michael testified that some racers do not want to travel because of the fuel and traveling more often would increase expenses.

On a good night, the track grosses $18,000 to $25,000, but Brown does not make a profit because of expenses for employees, fuel, fire crews, emergency crews, lighting, power, insurance, purse money, insurance, prizes, gifts, office supplies, and a website. The track is a business, not a hobby, and he hopes to eventually make a profit. It is his "lifetime dream" and he enjoys working. He does not race or own a race car. He is not certain of what he will do financially if the track is closed.

**Analysis**

We first address the harm to Brown. Triolo argues that the only harm to Brown is the "loss of uncertain potential income." We disagree. The injunction will not only interfere with Brown's own use and enjoyment of his property, but will also deprive him of his investment and business. *See Lee*, 397 S.W.2d at 925 (suit to enjoin planned race track involved the "conflicting rights of two lawful owners"). Brown would certainly suffer some harm as a result of the injunction.

As for harm to the public, Brown presents three primary reasons explaining why the public benefits from the track's existence. First, he suggests that the track provides a family atmosphere and influences young racers. Triolo points to Brown's testimony at a hearing on his motion for new trial, wherein he expressed his intent to acquire a beer license. However, Brown testified at trial that patrons may bring alcohol to the track in a certain size cooler. That alcohol may be served, as opposed to being brought in by patrons, does not automatically convert the track into a non-family atmosphere. Nor does it negate other benefits provided by the track. Second, racers have participated in raising money for charitable causes. Triolo argues that individual racers, not Brown,

raise money for charitable causes. Yet, the record contains testimony that the track aided, to some extent, the racers' participation in charitable events.

Third, the track promotes businesses and attracts racers from both the community and out of town.[2] Triolo maintains that the track is not a public necessity and Brown's evidence of economic value is not comparable to that in *Lee*, neither providing an estimate of economic impact nor testimony from business owners "attributing an economic impact to the track."

Lee sued to enjoin a planned race track and drag strip on Bowles's property. *See Lee*, 397 S.W.2d at 924. An interstate highway, an air force base, and a few residences were located in the area. *Id*. at 924-25. Experts testified that noise from the track would "double the average noise level created by the highway traffic." *Id*. at 925. Sounds from airplane jets might be louder at times, but were "infrequent and of short duration." *Id*. "[O]rdinary conversation could not be accomplished on [Lee's] patio during the races at a greater distance than one to four feet, and [] sleep would be difficult." *Id*. "[T]raffic conditions would be very congested." *Id*. Race cars were not equipped with mufflers. *See id*. Bowles testified that the season lasts five months, the track would operate primarily on Saturday nights, and races would end by 10:00 p.m. *Id*. at 926.

Several witnesses, including three state representatives, the Sheriff, a hotel manager, and a professional sports writer, testified that the track would benefit the community. *Id*. The record showed that "automobile racing is the second most popular

---

[2] Brown also notes that, at the temporary injunction hearing, the trial court expressed "no doubt that there is some benefit to this track existing."

sport in the United States from the standpoint of number of paid spectators, and is gaining in popularity; that this track would help the economy of the area and stimulate tourist trade; [and] that there were sufficient people in Bexar County interested in this sport to support a race track." *Id*. Several residents testified that the track would "stimulate growth in their area." *Id*.

The jury found that the track would "substantially interfere with the reasonable use of [Lee's] property…" *Id*. at 924. At a separate hearing, the trial court found that the "contemplated use of [Bowles's] property without a drag strip would be a nuisance," but "the equities were in favor of [Bowles] and the community." *Id*. The trial court permanently enjoined Bowles from "establishing, operating and maintaining a drag strip upon [his] property," but denied injunctive relief against the proposed track. *Id*. The San Antonio Court affirmed the judgment. *See id*. at 927.

Although the evidence of economic impact in this case may not be as compelling as that in *Lee*, the record does contain some evidence that the track has economic value. Triolo does not point to any place in the record showing otherwise. Additionally, the record shows that the track provides recreational benefits to the community, such as the driving school, opportunities for children to participate in the racing experience, recreation for families, improvement of the lives of young racers, and promotion of groups like the Mini-Sprint Association. We cannot say that an injunction closing the track would not cause some harm to the public. *See id*. at 926-27 (rejecting argument that balancing test did not apply because Bowles had not shown a public necessity: the

evidence supported a finding that the public generally would benefit from the track, "both from a standpoint of recreational value and as an economic asset").

Brown next contends that the harm to Triolo is slight in comparison to the harm that he and the public will suffer if the track is closed, arguing that: (1) the track's operation will not destroy Triolo's home; (2) the noise is not constant, as races take place a few months each year, once a week, and last no more than six hours; (3) the record contains no evidence that Triolo's health was affected; (4) Triolo reaped a substantial profit from selling property located near the track; and (5) the jury's award of only $3,000 to Triolo for loss and enjoyment that occurred over a two-year period, as well as the disparity between the $10,000 supersedeas bond for Triolo and the $100,000 bond for Brown, demonstrates that the harm to Triolo is insignificant.

In *McAfee*, the Fort Worth Court considered the harm stemming from a motocross course located on McAfee's property. *See McAfee*, 2008 Tex. App. LEXIS 968, at *2. The course consisted of two tracks and ran four days a week from 9:00 a.m. or noon until dusk. *Id*. at *1. The noise sounded like "thirty chainsaws" and a "bunch of jack hammers," caused difficulty having a conversation outside, "prohibited entertaining and reading outside," prevented outdoor sports, spooked horses, forced one neighbor to tranquilize his horse in order to shoe the horse, prevented "outdoor picnic[s] 'because you couldn't speak to each other,'" "prevented [one neighbor's] grandchildren from fishing and playing outside," and caused one business owner to have difficulty working. *Id*. at *4-5. The noise was "so loud that on four days each week appellees effectively could not use the land outside of their homes." *Id*. at *9-10.

Engineer Mike Fann testified that the types of engines used at the course would "harm the community when the noise systemically exceeded fifty-five decibels." *Id*. at *5. Fann concluded that "twenty or more motorcycles a day on the tracks would exceed the eighty-five decibel benchmark [identified by section 42.01 of the Penal Code] 'on a regular basis,' and one of the loudest bikes would surpass eighty-five decibels even at a distance of 1422 feet." *Id*.

The trial court granted a permanent injunction. *See id*. at *1. On appeal, McAfee raised several issues, including whether the evidence was legally and factually sufficient to support the trial court's balancing of the equities. *Id*. at *7. After finding that appellees presented evidence that the course "substantially interfered with their use and enjoyment of their land by causing unreasonable discomfort and annoyance," the Fort Worth Court held that "the trial court could have concluded that a permanent injunction would cause only slight injury to McAfee and the public or that such injury would be disproportionate to appellees' injuries because of the nuisance." *Id*. at *7-8.

Here, the evidence similarly demonstrates that the track substantially interferes with Triolo's use and enjoyment of his property, even if it does not show either physical harm to Triolo or destruction of Triolo's home. Triolo and other witnesses testified that the noise has been so loud as to drive them from their homes and cause them to contemplate moving in the event the track remains open. *See Storey*, 226 S.W.2d at 618 ("the law does not allow one to be driven from his home or compelled to live in substantial danger or discomfort even though the danger or discomfort is caused by a lawful and useful business"). That the track may not always be in operation does not

reduce the harm to Triolo, as witnesses testified that the noise was constant whenever the track was operating. *See McAfee*, 2008 Tex. App. LEXIS 968, at *9-10 (motocross course was "so loud that on four days each week appellees effectively could not use the land outside of their homes"). Nor does Triolo's profit from the sale of property located near the track negate the interference caused by the noise from the track. Triolo testified that he could have charged approximately $3,000 to $5,000 more per lot if not for the track. Brown did not present evidence controverting this testimony.

Nor are we persuaded that the amount of the jury's damages award demonstrates that the harm to Triolo is slight. The record simply does not disclose the jury's rationale for the specific amount awarded and we will not so speculate.

As for the bond amounts, Brown testified at the bond hearing that eighteen months of no racing would cost him $718,810, an amount based on projected income from the driving school, renting out the track, attendance, advertisements on t-shirts and fliers, beer and concession sales, registration fees, and the sale of billboards. Brown testified that the track had begun making a profit on the last three nights before it was closed. However, the trial court did not have the benefit of this information at the time the permanent injunction was imposed. The only such information available to the trial court at that time came from Brown's trial testimony that he had not yet profited from the track, but had lost an unspecified amount of money.

In summary, the trial court heard evidence that the track seriously interferes with Triolo's use and enjoyment of his property. *See Storey*, 226 S.W.2d at 617 ("a lawful business may become a nuisance in fact when it is operated in such a place or manner

as seriously to interfere with the enjoyment of life and property"). The trial court could have concluded that a permanent injunction would cause only slight injury to Brown and the public or that such injury would be disproportionate to Triolo's injuries because of the nuisance. *See McAfee*, 2008 Tex. App. LEXIS 968, at *8.

Brown next argues that: (1) Triolo was not entitled to injunctive relief merely because it is the sole form of relief requested; and (2) damages would have been an adequate remedy, but Triolo did not request such damages. However, the trial court has discretion to award injunctive relief where the evidence demonstrates that a nuisance is of a "recurring nature." *Holubec v. Brandenberger*, 214 S.W.3d 650, 656 (Tex. App.—Austin 2006, no pet.); *see Lamb v. Kinslow,* 256 S.W.2d 903, 905 (Tex. Civ. App.—Waco 1953, writ ref'd n.r.e.) (Where a nuisance is of a "recurring nature," an injunction "will lie irrespective of [a] legal remedy at law"). In such circumstances, monetary damages are not always adequate because "damages could be recovered only as of the time of the bringing of the action, and a multiplicity of suits would be necessary." *Holubec*, 214 S.W.3d at 656 (citing *Ellen v. Bryan,* 410 S.W.2d 463, 465 (Tex. Civ. App.—Waco 1966, writ ref'd n.r.e.)).

Although Brown plans to self-impose the time and noise guidelines outlined by the temporary injunction, he does not intend to stop holding races. He plans to add more stands and wants to run the most popular cars, *i.e.* sprint cars, if the noise can be managed. He testified that the car count will increase. Before suit, he had planned to conduct some two-day shows and he feels capable of doing so.

Triolo and others testified that the noise from the track is constant during its times of operation. Watkins testified that, despite the temporary injunction, the track is still "quite noisy," forcing her to leave home. Boegner testified that the noise initially seemed under control, but became just as loud. She cannot have a conversation, entertain guests, sit on the porch, or allow the children to catch fireflies outside. She admitted that the noise is not as loud and has been reduced "somewhat." Luedke testified that he still hears noise from the track on Saturday nights, as well as some Sunday and Tuesday nights. Denman, Dockery, Bomnskie, and Crenshaw all testified that the noise level has been reduced.

Shortly before trial, Triolo filed a motion for contempt alleging several violations of the temporary injunction: (1) Deputy Banks was dispatched to the Triolo and Boegner homes where he measured the noise and received three readings of 87, 92, and 89 decibels outside the Boegner home, 87 outside the Triolo home, and 65 inside the Triolo home; (2) Deputy Emig received a reading of 89 to 90 decibels at the home of a complainant who could not hear his television over the noise; (3) Deputy Bachman received several complaints, after which he measured the noise levels, which registered in the low eighties and low sixties; and (4) Cooper's two tests revealed readings over 80 decibels. Brown has received one citation since the temporary injunction, but claimed that the citation was issued on the first night of races after the injunction and that the problem was corrected. However, Cooper's testimony shed some doubt as to the ability of Brown's sound-reduction measures to sufficiently reduce the noise.

In light of the evidence, the trial court could have concluded that the track would continue to constitute a nuisance and that only injunctive relief would afford Triolo complete relief and prevent the nuisance from recurring. *See Holubec*, 214 S.W.3d at 656.

**Conclusion**

Because Triolo presented evidence that the track interferes with the use and enjoyment of his property and because that harm is not slight in comparison to the harm to Brown and the public, the trial court properly balanced the equities and did not abuse its discretion by granting a permanent injunction. *See Storey*, 226 S.W.2d at 619; *see also McAfee*, 2008 Tex. App. LEXIS 968, at *7-10. We overrule Brown's first issue.

**RESTRICTIVENESS OF INJUNCTION**

In his second issue, Brown contends that the permanent injunction is more restrictive and comprehensive than justified by the evidence and usages of equity. Triolo argues that Brown failed to preserve this issue for appeal. We agree.

To preserve a complaint for appellate review, the appellant must show that the complaint was made to the trial court by a timely request, objection, or motion. *See* TEX. R. APP. P. 33.1. In his motion for new trial, Brown raised issues addressing newly discovered evidence and the legal and factual sufficiency of the evidence to support the jury's findings, but he did not challenge the scope of the permanent injunction. *See id.*; *see also* TEX. R. CIV. P. 321 (motion for new trial must "briefly refer to that part of the ruling of the court…or other proceedings which are designated to be complained of, in such a way that the objection can be clearly identified and understood by the court").

In his motion for judgment notwithstanding the verdict and to disregard jury findings, Brown argued that the evidence is legally insufficient to establish nuisance, the evidence conclusively proves that the benefit of issuing the injunction outweighs the harm to Brown and the public, any alleged damages were temporary and/or abated, and the jury's findings are not supported by the evidence. He did not challenge the scope of the permanent injunction in this motion either. *See Chappell Hill Bank v. Lane Bank Equip. Co.*, 38 S.W.3d 237, 248 (Tex. App.—Texarkana 2001, pet. denied) ("[B]ecause the Motion for Judgment N.O.V. did not request the court to grant the motion for the reasons advanced in this issue on appeal, it did not preserve for appeal this claimed trial court error"). Nor did Brown file a motion to modify the injunction. Accordingly, he has failed to preserve his second issue for appellate review. *See* TEX. R. APP. P. 33.1.

We affirm the trial court's judgment.


                                                    FELIPE REYNA
                                                    Justice

Before Chief Justice Gray,
        Justice Vance, and
        Justice Reyna
        (Chief Justice Gray concurring with a note)*
Affirmed
Opinion delivered and filed December 3, 2008
[CV06]

\*      (Note by Chief Justice Gray: "Chief Justice Gray concurs only in the judgment of the Court to the extent that it affirms the trial court's injunction. A separate opinion will not issue. He notes, however, that the Court erroneously states that "the trial court

*properly balanced the equities* and did not abuse its discretion by granting a permanent injunction." (Emphasis added). In our review we do not determine whether the trial court properly balanced the equities. Our review is limited to whether the trial court abused its discretion. Further, I can only hold that the trial court did not abuse its discretion by granting the permanent injunction. If the scope of the issue presented on appeal could properly include the scope of the injunction, I would conclude that the trial court's injunction was overbroad. The appellant failed to preserve the issue of the scope of the injunction and therefore the scope of the injunction is not properly before us for resolution.")